Ms. Hyatt, would you announce our third case for argument today? Yes, Judge. The third case for argument, 22-1112, District of North Dakota, United States v. Douglas Schneider. Mr. Heck, the court notes you've been appointed under the Criminal Justice Act, and we appreciate your willingness to... Mr. Hershker, Your Honor, that is Mr. Heck at counsel. Oh. I'm sorry, what's your name then? Attorney Drew Hershker, Your Honor. Last name is? Hershker, H-U-S-H-K-E-R. Ah, okay. That's our recent motion that we granted. Yes, Your Honor. Got it. Thank you, Mr. Hershker. We appreciate both of your willingness to accept the appointment then.  Your Honor, may it please the court opposing counsel, as I just indicated, my name is Attorney Drew Hershker, and I'm here representing Appellant Douglas Schneider in this case. This case poses a simple, straightforward question of whether or not a district court violates the prohibition on participating in plea discussions when a district court judge advises on what terms it will or will not accept in a future plea agreement. We argue that the answer to that straightforward question is yes, and we ask for a vacator of the sentence and plea agreement in this case and on-remand reassignment to a new district court judge. Counsel, I think the more difficult question is whether that violation affected Schneider's substantial rights. And I find this case to be pretty challenging, but a big question I have is how should this court determine whether a reasonable probability has been demonstrated that he would not have pled guilty but for the violation? Thank you, Your Honor. The Harrison case wasn't a case that was cited in any of the briefs in this case, but it was, I believe, this is a 2020 decision, citation 974, Fed 3rd, 880, spoke directly to that issue for whether or not there was affecting of a substantial right. It goes to whether or not there is a reasonable probability that but for the mistake, the case could have turned out differently. So again, it's important to figure out what this reasonable probability is. It's not beyond all reasonable doubt in a criminal case. It's not even a preponderance of the evidence. It's not even as low as probable cause. The United States Supreme Court, in the decision of Dominguez v. Benitez, 542 U.S. 74, specifically footnote 9. Now, counsel, all these cases you're giving are not in your brief, right? This one is in the brief, Your Honor. Okay, good. Well, any that aren't, please tell us about them because first I'm hearing some of them. Yes, Your Honor, and my apologies for that. Write a 28-J letter in due course. Go ahead. Thank you, Your Honor. Again, that case is in the briefs, Your Honor. In footnote 9, the U.S. Supreme Court goes out of its way to describe that the reasonable probability standard, again, is lower. It's just whether or not it's less than a probability of the comparison case goes, whether or not there is enough that could undermine the confidence. And so, again, we would liken it to a reasonable suspicion standard. It's not a particularly high standard, but just whether or not the court could question whether it could be different but for the mistake. What does this court rely on to assess that, whether that standard has been met? Your Honor, we would argue that the court should look at the totality of the facts and the totality of the circumstances that are found in the records. Specifically, the facts in this case are, is that after there was a binding plea agreement, it went from a binding plea agreement to a non-binding plea agreement after this statement was made by the district court judge. After the district court judge's statement, the level went up significantly. Not only did it go up significantly, but it went up to the specific guidelines that Judge Treanor outlined. They were at 12 and a half years. He said, I'm not going to do that, which he's permitted to do. He's permitted to reject a plea agreement. But then he goes on to say, and I'm not going to do 15 years. There wasn't a 15-year offer on the table, but he also says, I'm not going to do 15 years. I would do a guideline range, and I would do this particular guideline range. And then when the parties come back, lo and behold, they're at that exact guideline range. In a non-binding agreement. In a non-binding agreement as well. Now we have, in the cases I read, we have a cure doctrine, that that can be cured. I bet you're aware of that line of cases. Was it cured at the second hearing by all the judge said, you're aware of it, four or five times, did that amount to a cure? No, Your Honor, and I believe the case laws and the cases that we cite, the Krauss and the Kyle decisions from the Seventh and Ninth Circuits. Counsel, talk about our cases, would you? It'd help us if you focus on Eighth Circuit cases like Thompson. The Thompson case, Your Honor, was a different case in that they did not find that there was, this court found that there was not necessarily a clear violation of it. The Thompson case, how it came about was the court discussed with the defendant whether or not the plea offer was on the table and what the potential sentence would be if he went to trial. And so there was a discussion about the actually negotiated offer that was on the table and what trial was. In this case, in the Eighth Circuit, and I believe all circuits. In Thompson, there was a brief recess and they came right back. Here, there are seven months, right, between the two hearings? Approximately seven months, Your Honor. I believe it was March and July. Now that's a big difference, isn't it? Big difference. Between going in the next room and coming right back and having seven months and you make a non-binding agreement in the seven months? It is, Your Honor, but I believe that that, it goes to how this was affected. It goes to the negotiations between the parties and that Judge Traynor's comments were an anchor once he made those comments. He said, I'm not going to do 12 and a half. I'm not even going to do up to 15, if you guys come up to 15. I'm going to be, would be willing to entertain that. And so he created an anchor. He created a starting point for those future negotiations. Suppose he violated the rule with all that, okay? Yes. What about, please address the second time, the second hearing, seven months later, when he goes at length, what they suggest is not binding on me in any way. You understand I can give you the max. He says that several times. Yes, Your Honor. I'm afraid to count, but the max, maximum amount, max, max. He does both versions of the word several times. I could give you that and the defendant keeps saying yes to all that and you don't object then. Your Honor, it's a difference, I guess I would point out I wasn't the counsel. No, go ahead. But there's a difference between understanding that the judge could, in theory, go up and give the maximum and also understanding what the judge did say before and saying, I will accept this plea agreement. Your position is you believe the judge at one hearing and don't believe him at the other, right? Your Honor, I believe. That's what the defendant should think. Your Honor, the standard is whether or not there's a reasonable probability that he could believe him at the one hearing and not at the other. Again, there's a difference. Believe what the judge says. Believe what the judge says. Yeah. There's a difference and I don't believe they're mutually exclusive, Your Honor, of saying, I can go up to the maximum, but I told you I will accept and I will sentence you within this guideline range. I have the ability to go up and depart to the maximum, but I will sentence you within the guideline range. Well, I don't know. You've looked at the judge's words. Do or die moment. You can't go back. I can throw this all out. What they suggest is not binding in any way. You know the words he says several times. And it says up to the rest of your life, he says, clearly. Yes, Your Honor. Doesn't that cure it in the Thompson? Your Honor, I don't believe the Thompson spoke of a cure in that matter and I believe that would, to apply the cure doctrine that far would overwhelm or would overrule a whole entire violation of 11C1 that if a plea agreement is eventually What 8th Circuit cases would it overrule in your terms? Sorry, Your Honor? What 8th Circuit cases would it overrule in your terms of talking about it? Your Honor, I don't believe I've found any circuit case that has talked about what a district court would be willing to accept in a future plea agreement. And that's why we cite to the Kyle case and the Krause case, which the 8th Circuit specifically found were persuasive authority. That's why we cite to the Kroll case and the Miles case from the dealt with what, when a district court says what terms they will accept and will not accept. I have not seen. So, candidly, your argument is our circuit's out of touch with the other, out of step with the other circuits. No, Your Honor. I believe this circuit has not faced this question of when the taint goes and when a district court says what they will and will not accept. I do not, we did not find a case on point from the 8th Circuit or in the district court regarding a district court affirmatively advising what sentences it would or would not accept in a future plea negotiation. That when it makes those statements, when it injects itself, it creates it, like I said, an anchor point that steers the conversation forward and it cannot be gone around. That bell cannot be unrung is the quote that's used in many of these cases. Once that bell is rung, once Mr. Schneider heard that comment, once Mr. Schneider said, I am willing to do this, that bell cannot be unrung no matter what is said at the 11th or at the 11 plea colloquy. Otherwise, the plea colloquy could essentially erase any comment. The judge could get up there and could threaten at a prior hearing, you need to plea guilty or I'm going to do X, Y, and Z. And they go and they negotiate a plea agreement and they go now and they recite the plea colloquy and as long as those boxes are checked later on, no matter what the district court judge earlier on does, essentially it would allow a cleansing. And I don't believe that would be appropriate under the law. I believe that would be a radical departure and I think that would be a radical departure in this case. I also do want to speak briefly on the appropriate remedy in this case as well. Obviously, the remedy we are asking for is a vacator of the sentence, the plea agreement itself, and remand to a different judge upon assignment. That a term of 240 months should be entered, right? Your Honor, the case law speaks of this court when an 11C1 violation of trying to undo the taint of the judge's prior involvement. Since that taint went back before this plea agreement was even involved, was even entered, the plea agreement, I believe, was tainted from its outset and so I don't believe that there could be a specific enforcement type situation. I believe to fully get away, to fully remedy all the taint, it would have to go back to the plea, pre-plea posture and with reassignment as well. I can speak candidly, I think... So he could get life? He could still get life, Your Honor, yes. He very well could. He could go back, he could be reassigned. Under your theory, I mean, he still could get life? Very well could, Your Honor, yes. Again, that was a legal sentence. It was the guideline that was calculated. That could still be his ultimate sentence, whether it's by plea agreement if non-binding or whether if he goes to trial and is convicted, he could get life. We're not saying that he needs to get the sentence that was outlined, but we're saying we need to rewind it back and to get rid of the taint. Obviously, I've kind of skipped over whether or not there was an error, a plain error in this case. I believe, again, obviously, that there was an error, the 11th... Underlying this whole discussion, you agree we're here on a plain error review, right? Yes, Your Honor. We believe that the plain error standard is there, that we have to show that there was an error, that it was plain, that it affected substantial rights and that the fairness and integrity would be implicated, but for a resolution in this case. We believe that the fairness and integrity would also be impacted as well, Your Honor, specifically in the Barker case that we do cite in our brief. It provides, quote, inevitably severe... That 11C violation, quote, inevitably severely affects the fairness and integrity of judicial proceedings... What circuit's that one, Barker? The Bakers, I believe, is the Second Circuit, Your Honor, and that goes to the purpose of in this prohibition at its outset. It's to prohibit even the risk of coercion, whether or not a district court actually coerces a defendant into it, but by simply even providing an indication of what it believes is fair or is not fair, there's a risk of coercion, whether or not that coercion comes into effect. It also avoids the appearance of impartiality for when there's ultimately a sentence going on there, even if the district court is still impartial. And finally... Also, I believe the circuit has said that that's an absolute prohibition. Is that right? Yes, Your Honor. I believe it's an absolute prohibition that's strictly construed, is the term of art in the Eighth Circuit, I believe. And unless there are any other questions, I was going to reserve three minutes of my time and I'll stop you at this point. Very well. Thank you. Thank you. May it please the Court, Counsel. My name is Gary DeLorme and I represent the United States on behalf of this matter, now before the Court. In drafting the brief that was on whether or not the Court could have saved us this trip to oral arguments today had the judge merely indicated that if that was the guidelines range at the time of sentencing, I will impose a sentence within the range, which is what I believe the Court had meant in its comments at the rejected binding plea agreement. The Court went on to try to explain that during the sentencing hearing, towards the end of the sentencing hearing, indicating I cannot be bound, essentially, by what I said then because I was relying on a proposed guidelines that was faulty by the parties and didn't take into account what was determined by the Court at the time of sentencing. You agree there's a violation, right? I believe there may be an error here, Your Honor. I don't know if it goes to plain error, but I will agree that... I don't believe it's plain error, Your Honor. I think it's cured... You know the factors. I'm going to change the second factor. So you don't think it's a plain error? I don't think it rises to that, Your Honor. He guarantees the sentence? He just puts a comment on a sentence and he guarantees it? I don't know if he guaranteed that, Your Honor. Yeah, he used words like that. Yeah, he did. I want to defer just briefly to my second argument in the brief where I discuss the waiver of appeal. And the reason why I want to do that, because I do believe this matter was cured at the change of plea hearing, which occurred seven months later. You take into account that you have a sophisticated defendant, a person who was, I believe, mid-50s at the time of sentencing. He had a number of years as a law enforcement officer. He had a number of businesses that he operated and maintained throughout his life. He had, what he indicated during the colloquy with the judge during the change of plea, adequate counsel was provided to him. He indicated that he understood the terms of the plea agreement. And then there was at least three advisements and admonitions by the court during that period of time, during that change of plea, seven months later, that the court was not bound by what the parties were recommending. Counsel, I think you're hitting upon a very key issue in this case. So let me ask you about that. So earlier, the judge had made some very specific comments about acceptance of a sentencing range. So how does a later statement reciting general statements of law regarding a non-binding plea agreement, how does that cure the more specific statements? It does, Your Honor, because by this point in time, you know, when you look at Thompson, one of the things that the court discussed in Thompson was temporal proximity. That particular case there, you had, I believe it was the same day that the court made the aired comments. So over time, he should forget what the judge promised him in the plea agreement? I think there's a combination of a lot of things, judges. Over time, because he is a sophisticated defendant and he had adequate counsel that he indicated at the time of the change of plea. In addition to that, he had opportunity and indicated he had opportunity to review the plea agreement in total with his counsel prior to signing it and its filing with the court. During the colloquy, he indicated that he understood all of the provisions of that particular time. When you take all of that into account... But the judge said at sentencing was true, it's non-binding. But how does that change what he told the defendant earlier? It's not inconsistent, I guess is my... Right, Your Honor. When it changes, it cures it in that the court is saying, look, I could throw this all out. You know, whatever I said earlier, I'm telling you this now, this is non-binding on me. I can take what the parties recommend. I could throw it out the window. Regardless of what the guidelines is, I can go all the way up to the range of life, which is indicated in, I believe, Paragraph 7 of the plea agreement. That was always true, was it not? That was true for the accepted plea agreement, yes, Your Honor. The only difference between the... But wait, what was allowable under the binding plea agreement, the first one that was rejected? Under the binding plea agreement, I believe it would have been a guidelines range of 210 to 262 is what the parties believe. What did he get for it? What was he getting for the binding agreement? He, the defendant, what was he getting? He would have got a recommendation of 210 months from the United States. So he only got a recommendation? Right, recommendation of 210 from the United States. The court would have been bound, I think, to the range that was determined. And we believed at that time that the range would have been 210 to 262. And actually, that, what the United States was recommending in the binding one was 180 months. So below the actual... He got a guideline range and a government recommendation, right? Guideline range and government recommendation. And that's what he got... Is that it? In the binding, the first one? That's pretty much it, other than the standard waivers, yes, Your Honor. And that's what he received, basically, in the second one as well, is he got a 210 recommendation from the United States, which was low end. So we would lock ourselves in, basically, to that low end. And that's based, again, upon our indication, our initial indications that the range would have been 210 to 262. When you look at the substantial rights, if you go past... I guess, going back to my initial argument, is if we get to a point where it is cured and his plea at the September 8th hearing is knowing and voluntary, then the waiver, I believe in the analysis, the waiver would kick in and that would be the end of the judgment. If the court does not... I'm confused. Can I go back to the binding plea agreement? Yes, Your Honor. Your discussion with Judge Benton suggested that there was a guideline 210 to 262 and you were going to recommend 210? I was going to recommend 180, Your Honor. That's what I was going to recommend as part of the binding plea agreement. And the court was going to be bound at 180? Bound to 180. Okay. Yes, Your Honor. All right. So it's more than a recommendation. Right. Well, it is more than a recommendation. The court would have been bound as well. A lot more. Well, thank you. I took it just to be a recommendation. No, I'm sorry, Your Honor. That's not a binding plea agreement. That didn't sound to me like much of a binding plea agreement. I'm not a former United States attorney. And ultimately, the court rejected the binding. That appeared to be what the most sticking point was. Now I understand. What you were describing with Judge Benton was not a binding plea agreement. Right. That's correct, Your Honor. A recommendation is a recommendation and he could have still given life. That's not an 11C1C plea. Correct. Now I understand. Thank you. So even if you get past that point, you still look at the portion of, well, but for those comments, would he have pled guilty in this particular matter? And you look at all the things that he received in the plea agreement, he received obviously the recommendation of 210 that the United States offered. And the United States did give that 210 recommendation, even though the guidelines did come out higher during the sentencing hearing in a particular matter. He also, even if that would have been the range, he would have received, I believe, he would have been a 292 to 365 had he not pled and not received the three points acceptance as well. So there is that motivation. He was a motivated person in issuing this, his plea to the court and asking the court to accept that plea. So he was receiving something. And again, when you look at the admonishments of the court in the change of plea hearing, you look at the sophistication of this particular defendant, you look at the time period that transpired between the rejected binding plea offer to the court and the filing. It was four and a half months between that rejection and the filing of a new plea agreement. So the defendant arguably had enough time to discuss the matter with his attorney before agreeing to sign the new plea agreement. And the new plea agreement did nothing, changed nothing but two things. It took away the binding language from the court and the United States would offer a low-end recommendation of arguably 210 is what we believed it would be at the time. But the context has to be important too, doesn't it? The context being that the judge said what he would impose as a sentence if there was a guilty plea. Are you referring back to the rejected language? No, the second. The second one, yes. Correct, Judge Barras. When you look at what the judge indicated, I mean, again, at least three times is what I looked at. And it's probably a little bit more that the judge actually referenced the maximum range that the judge could impose. But at least three times specifically to the defendant in the colloquy going back and forth, he indicated to the defendant, I can throw that out the window and I can give you the maximum. I can give you up to life. The third admonishment, the one that I believe just took place just before the plea was accepted by the court, involved the court even one last opportunity to tell them this is a do or die moment for you. You either enter it and you're stuck with what you get. And that's what we're here for today is, you know, come sentencing time, the range actually was determined to be a life range in this particular matter because there was a five-level increase that our pretrial services determined in PSR as well as a two-level increase that the parties had not anticipated. Counsel, at what point can we look at the impact on the integrity of the proceedings? Do we have to first assess whether there's a cure or is it all kind of one assessment? I think you have to go, your cure first, then you look at the substantial rights and then the effect on the proceedings, Your Honor. I think that's kind of the way it seems to line up in the cases. And as far as the best cases for the United States, I'm going to tell you right now, they're all eight-circle cases. It's U.S. v. Thompson, U.S. v. Todd, and I argued in my brief, U.S. v. Neskoda, all of which- Does it make any difference that, unlike in Thompson, Schneider did object to the PSR enhancements that led to the life sentence? I don't think it does, Your Honor, because, like Thompson, he didn't file a motion to withdraw. He didn't give any other indication that he did not want to proceed or object to the court going beyond a 210-262 months. He objected to the enhancements, but he also agreed to a criminal history category of two, which would have raised it to a 235-293. So that really didn't kind of affect it because he knew from the admonishments what the ranges were going to be in this particular matter, and yet he did offer his plea to the court. And the court accepted that plea and tell him it's a do-or-die moment. You're stuck with whatever you get after this point. After I accept your plea, you're stuck with that. And given the sophistication of the defendant, he couldn't possibly believe that, you know, the court was going to tell him all of this at this change of plea, curing what the court had said earlier, and then come back and say, well, I'm just going to give you a 210-month sentence. Thompson has factors. And one factor is the extent to which the defendant relies on it or gripes about it at the time, gripes about the previous comments at the time. And you're aware of what Schneider's counsel said. I think Mr. Schneider's relying on that he be sentenced under a 37 looking at a 216. I'm not trying to throw any quotes back. He means to the court. He says from the court, but he means to the court. Throwing quotes back to the court. We didn't anticipate this. So that factor in Thompson is for the defendant here, isn't it? It is, Your Honor, but at the same time acknowledging. There's no similar language in Thompson, right? No, there's no similar language in Thompson. But what Thompson also did point out, too, is that the defendant never tried to withdraw a plea or asked the court for a motion to withdraw. And at that point, that was prior to sentencing being imposed, talking about the range, when counsel was discussing, I don't want to throw back any quotes to the court, there could have been time at that point to say, well, Your Honor, because this is not what we anticipated based upon your language order, we want a motion to the court to withdraw at this point. That was not done. And like Thompson, that was a specific point. I think Todd also pointed out that there was no motion to withdraw filed or requested verbally at any time, which is a factor that weighed in favor of affirming the court's imposition of sentence. Counsel, what would the logic be in filing a motion to withdraw if you thought you already had a good deal for 210? Well, once he had the PSR in hand, Your Honor, that was approximately, I think, five weeks prior to sentencing. You get the draft portion of PSR. You see what's in it. That could have been filed at that point. Plus you got one week from the time that it's actually filed in the court system with the district court. Right, but wouldn't your chances of getting life increase rather than decrease with a withdrawal? Are you talking about if he withdrew and then came back and tried to do another plea or went to trial? That's true, Your Honor. I'm asking what the logic would be in filing a motion like that. Probably would be no logic to it. I mean, he had just as much of a chance to argue to the court to try to get a lower sentence regardless at that point. But we created a system where there's a terrible violation. The defendant has an incentive not to object at the trial court, right, and then raise it on appeal. That's the system we've come up with with all these cases, correct? I think that's generally how it kind of comes up in these cases, Your Honor. It's one of these things where it's going to end up on appeal. It's going to end up before this court, and this court has to make an analysis and decision. I'm asking the court to make a decision that's in line with Todd, Thomas, and Nesgoda in this particular case in that I believe that with the colloquy and everything else that transpired between the court and the defendant at the change of plea, the matter was substantially cured at that point. And Mr. Schneider proceeded and offered his plea. At no time thereafter did he offer to withdraw or motion to withdraw, which likely wouldn't have had no effect anyway, as Judge Bras points out. Why would we penalize him for not filing a motion that made no sense to file? That's my question. Well, it would have been evidence, evidence that he actually wanted to, that it had a but-for effect on his particular matter. And that's what is looked at in Thomas and Todd, is that there is some evidence, and the only evidence offered in this particular case is they're saying that it would be illogical to proceed. And that's not evidence. There's nothing on record. I see my time is up. I thank you, Your Honor, for your time. Thank you, Mr. DeLorme. Thank you. Thank you, Your Honors. For my rebuttal, I'd like to begin briefly with the, as was discussed with Mr. DeLorme, the binding plea agreement because the facts are a little bit different than what was outlined. This is all available at page 7 of the appendix. The initial binding plea agreement was a binding recommendation from both parties at a 150-month sentence, so a 12-and-a-half-year sentence that was binding on the district court that both parties would agree to jointly recommend. And that's important because that goes to what Judge Treanor said in rejecting that agreement. He said that he wasn't going to accept that agreement. Not only did he say he wouldn't do 12-and-a-half years, but he said, I'm not going, he's not going to get 15 years. So he said, even if you come back at a slightly higher plea agreement, I'm not going to do that. But I'll accept a guideline range. I'll accept this particular guideline range. And that goes to whether or not his comments showed that they affected the plea negotiations between the parties because they came back not at a 15. They came back not trying to negotiate something between 15 and 210 at that recommendation. They came back at exactly the guideline range that Judge Treanor said that he would accept. It shows that his comments directly affected and was, in effect, a participation in the plea discussions between Mr. Schneider and the government at that point once it was made. The government argues that this case, the courts- Did he end up at a 37? In the PSR, did it say a 37 or not? They keep saying a 37. It came back at a higher number. That was the higher range. Does that completely qualify the judge's main promise? I'll sentence him with the guidelines under a 37. Is that an escape hatch for the district court? Maybe even not having a violation. Your Honor, I don't believe so because I think even saying I will give him a guideline sentence is participating. Well, he says under a 37 in that sentence. Yes, Your Honor. I believe- Later he says guideline range. Proceed. I believe both are a violation because- I wanted to be sure I understood the 37. Go ahead. Yes, I believe both are a violation because even just saying I'll do a guideline range is- In effecting the party's negotiation. The government argues that Todd is applicable and controlling in this case, Your Honor. Todd goes to whether or not the proper admonitions are made during an 11C plea colloquy. I don't believe it's on point factually. It's distinct from this case. Nesgoda, I believe, is also not on point. Again, it goes- In that case, the district court discussed the merits of a plea agreement that had already been discussed and negotiated between the defendant and the government. It simply went through with the defendant what the actual terms of that agreement meant. That's something the district court needs to do, Your Honor. Once the parties have reached the agreement, they need to bring it to the court. The court needs to review it. So Nesgoda is factually an opposite as well. And Thompson actually goes to Judge Gratz's point of supporting us in this case. It goes to Thompson assumed without deciding that there was an 11C violation. But the court found that there was not a substantial- Substantial rights weren't affected because there was no evidence in the record that that violation played into the defendant's decision to plead guilty. Here, as you indicated, Judge Benton, there is an indication. And that was Attorney Hecht's comments during the sentencing. Quote, I think Mr. Schneider was in part relying on that he be sentenced under a 37 looking at the 210 to 262 months. Even if it says 37, though. Go ahead, counsel. Yes. Again, that's all. I'm not going to read the whole quote back. But that paragraph talks that he was relying on that statement. That's page 131 from the appendix. And so that is evidence that he was relying on this. And so that is why Thompson doesn't control this case. In the end, Your Honor, as I indicated at the outset, this is a straightforward application of whether or not there's a plain error when a district court judge says what he will and will not accept. We believe all the cases hold that that is a plain error. We believe this court should hold the same in this case. I see I'm out of time. Thank you for your time. Thank you, Mr. Reschke. Thank you, counsel. We appreciate your appearance and briefing. Case is submitted and will issue an opinion in due course. Thank you, Your Honor. And we will submit the rule six, or rule 25. Very well.